PEQUOT ASSOCIATES *vs.* BOARD OF ASSESSORS OF SALEM
& another[1]
(and a companion case).

Suffolk. April 4, 1978. — August 29, 1978.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, WILKINS, & LIACOS, JJ.

*Taxation,* Urban redevelopment corporation. *Urban Redevelopment Corporation,* Excise tax. *Contract,* Construction. *Practice, Civil,* Parties. *Words,* "Completion," "Substantial evidence."

A conclusion by the Appellate Tax Board that the valuation governing the excise tax liability for 1974 and 1975 under G. L. c. 121A, § 10, as amended, of the developer of an urban redevelopment project was $300,000 for the land and $3,470,000 for the building, was supported by substantial evidence, including evidence that the project was completed and occupied in 1974 when the building inspector approved the building for occupancy, and that the developer reported gross income in a substantial amount for 1974, and considerably more for 1975 [273–274]; without merit were contentions of the developer, who claimed that only the land valuation governed, that issuance by the Massachusetts Housing Finance Authority of a "certificate of approval and acceptance" of the project determined completion, and that evidence that "each unit" was occupied was necessary [274–277].

Under a contract entered into in 1972 pursuant to G. L. c. 121A, § 6A, whereby the developer of an approved urban redevelopment project agreed to make annual payments to the city in lieu of special assessments and betterments according to a formula controlling "during construction" in each calendar year "prior to *and including* the calendar year in which the building ... shall be completed," and where it appeared that completion occurred in 1974, this court held that the developer's liability for that calendar year was governed by the "during construction" formula, and that the developer's greater liability for the calendar year 1975 was governed by an "upon completion" formula. [277–278]

---

[1] State Tax Commission.

This court allowed the request of the State Tax Commission that the appeal in a proceeding in which it was named as an appellee be dismissed as to it where it appeared that the controversy was between the developer of an approved urban redevelopment project and the city with respect to an excise payable to the Commonwealth but paid over to the city, and that the developer sought no relief against the commission, which had not participated in the hearing before the Appellate Tax Board. [278–279]

APPEALS from decisions of the Appellate Tax Board.

*Myrna Putziger* for the taxpayer.

*John E. Bowman, Jr.,* Assistant Attorney General, for the State Tax Commission

*Richard W. Stafford,* Assistant City Solicitor, for Board of Assessors of Salem.

HENNESSEY, C.J. These are appeals from decisions of the Appellate Tax Board (board). The appellant Pequot Associates (Pequot) is a limited partnership acting as an "urban redevelopment corporation" pursuant to G. L. c. 121A. The only issues before us are whether the board's decisions are supported by substantial evidence or are erroneous as matter of law. See generally *New Bedford Gas & Light Co.* v. *Assessors of Dartmouth,* 368 Mass. 745, 749 (1975). As will be developed, the board's decisions affect Pequot's liability, in 1974 and 1975, for the urban redevelopment excise tax. See G. L. c. 121A, § 10, as amended by St. 1969, c. 540, § 1. We affirm these rulings. The board's decisions also affect Pequot's liability, in the same two years, under a contract entered into with the city of Salem (city). See G. L. c. 121A, § 6A, inserted by St. 1960, c. 652, § 5. We hold that the board erred with regard to Pequot's contractual liability for 1974, but we affirm the board's ruling as to contractual liability for 1975.[2]

Pequot is the owner and developer of Pequot Highlands (project) a low and moderate income housing project of 250 units, which was approved as an urban redevelop-

---

[2] The case was before this court previously on a jurisdictional issue. *Sydney* v. *Commissioner of Corps. & Taxation,* 371 Mass. 289 (1976).

ment project on April 19, 1972. Under G. L. c. 121A, § 10
(first par.), the project is exempted from property taxa-
tion for forty years, but the Commonwealth levies, in-
stead, an annual excise of five per cent of the gross in-
come of the project plus one per cent of the fair cash value
of the real estate and improvements constituting the proj-
ect (with certain provisos). § 10 (third par.). *Sydney* v.
*Commissioner of Corps. & Taxation,* 371 Mass. 289, 290-
291 (1976). The local assessors are required by statute to
determine the fair cash value of the project as of January
1 of each year, and this determination serves as the basis
for assessing the excise for the previous calendar year.
G. L. c. 121A, § 10 (second par.). However, if the Depart-
ment of Community Affairs requests, the local assessors
make a determination of the maximum fair cash value of
the project as proposed, or of such values of any stages of
the project, and their determinations then constitute the
upper limits of value in the computation of the excise,
except when it is shown that real estate or tangible per-
sonal property has been acquired which was not included
in the project as proposed. § 10 (seventh par.; cf. fourth
par.). *Sydney* v. *Commissioner of Corps. & Taxation, supra*
at 291.

The Department of Community Affairs requested the
board of assessors (assessors) to determine a maximum
fair cash value for the project, and the assessors did so on
July 12, 1972, as follows: $300,000 for the land, and
$3,470,000 for the building on completion and occupancy
of each unit, for an aggregate maximum fair cash value
of $3,770,000 on completion.

The value of the project also affects Pequot's contractu-
al liability to the city. Pequot has agreed to make annual
payments to the city in lieu of special assessments and
betterments. See generally G. L. c. 121A, §§ 6A, 10. On
July 12, 1972, Pequot agreed to pay the city annually the
excess of the respective following amounts over the ex-
cises payable pursuant to § 10: in each calendar year
through the year in which the building was completed, an

amount determined by multiplying the real estate tax rate for such year by the fair cash value of the land, agreed to be $300,000; and in each subsequent calendar year (through the fortieth year in which the project is subject to c. 121A), an amount equal to fifteen per cent of the gross income of the project for the year (but not more than the real estate tax rate for such year multiplied by the maximum fair cash value of the project as fixed by the assessors). *Sydney* v. *Commissioner of Corps. & Taxation, supra* at 291.

The dispute here arose when the assessors determined that the fair cash value of the project as of January 1, 1975, was $5,770,000—$2,000,000 more than the previously established maximum. Pequot appealed this determination to the board. The assessors made an identical determination for January 1, 1976, and Pequot appealed again. The board consolidated the appeals, held a hearing, and issued a single opinion.

The assessors had asserted that they were justified in exceeding the maximum fair cash value because Pequot had breached its contract. The board ruled that a breach of contract—if in fact the contract had been breached—was no justification. This ruling has not been appealed. The board also found that the Pequot project had been completed in 1974 and was thereafter occupied. It concluded, therefore, that the valuation governing Pequot's liability both for the excise and under the contract was $3,770,000. Pequot claims that the $300,000 valuation should govern its excise tax liability and its contractual liability for both years. We consider these questions separately.

1. *Excise Tax Liability.*

(a) *Error of law.* The parties do not agree on the date the building was completed. The board found that completion occurred in 1974. It based its conclusion on the fact that the building inspector of Salem approved the building for occupancy on May 1, 1974, and that Pequot later reported gross income of $609,148 for 1974. The

assessors argue, therefore, that as of January 1, 1975, the $3,770,000 figure was the applicable valuation.

Pequot maintains that, although the building was habitable in May, 1974, the project was not completed, for valuation purposes, until the Massachusetts Housing Finance Authority (MHFA) issued a "certificate of approval and acceptance" for the project about ten months later, on February 28, 1975. Pequot argues that, as matter of law, the date on which the MHFA issued its certificate should be deemed the date of completion for purposes of calculating the excise tax in this case. We decline to adopt that standard.

The MHFA is the lender that financed the project. Its regulatory agreement with Pequot provides that a general partner may not transfer his interest in an urban redevelopment project until the project has been completed, as evidenced by a certificate of acceptance and approval. Clearly, the MHFA's purposes for ascertaining the date of completion relate only to its interest in ensuring the financial stability of the project. There is no necessary connection between the date on which the certificate issues and the date on which the project begins to generate income subject to the urban redevelopment excise tax. As far as can be determined from the record before us, the ten-month interval at issue here may be attributable only to administrative delay.

The board conducted a common sense inquiry into when construction ended and when the project began to generate income. It is clear to us that the board acted appropriately in deciding these cases on the evidence before it rather than in adopting as the time of completion an arbitrary date, the significance of which is unrelated to the revenue raising purposes of the urban redevelopment excise.

(b) *Substantial evidence.* Substantial evidence means "such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6), inserted by St. 1954, c. 681, § 1. The evidence supporting

the board's decision satisfies this standard. The board found that the project was completed and occupied in 1974, and that, as a consequence, the fair cash value was $3,770,000 as of January 1, 1975, and January 1, 1976.

Pequot's argument is that there is no evidence in the record showing that each unit in the project was occupied in 1974. We hold that none was necessary. It is true, of course, that the assessors' determination of maximum fair cash value was communicated to Pequot in a document stating that the building would be included in the valuation along with the land "on completion and occupancy of *each* unit" (emphasis supplied). We read this document for what it is—merely a letter. It should not be construed or invested with unwarranted legal significance.

When it was written, the letter represented an attempt to assign a value to the project at the point in which the project would be underway. Pequot had the information to establish exactly when the building was occupied, and twice when the assessors requested Pequot to disclose this information, Pequot declined to do so. In the absence of direct evidence, the board was free, of course, to rely on circumstantial evidence to find this fact. In any event, the date when the last unit was occupied has little bearing on the value of the project as a whole.

The value of the project for excise tax purposes could not exceed $3,770,000 once the project became a going concern. The board found that the project became a going concern in 1974, and it rolled back the $5,770,000 valuation to the level of the previously established maximum. This decision must stand if supported by substantial evidence, and we now review the evidence on which the board based its conclusions.

The board had evidence that on May 1, 1974, the inspector of buildings issued a "certificate of approval for building occupancy." This certificate was signed by the city engineer, the wiring inspector, the plumbing inspector, and the fire department inspector, in addition to the

inspector of buildings. The ordinance governing issuance of the certificate provides that "the certificate shall be issued . . . upon completion of the work." City of Salem Zoning Ordinance § 9, Part A, Enforcement, subparagraph (2). The board had testimony from one of the partners that Pequot had income in 1974 attributable to rents; it also had Pequot's excise return for 1974 and 1975. In 1974, Pequot reported $609,148 as gross income from all sources. Clearly, this evidence might permit a reasonable inference that the project was completed and occupied in 1974.

Pequot makes two additional arguments, both of which are without merit. Pequot first argues that its 1974 excise return showing $609,148 in gross income has little or no tendency to show that the project was completed and occupied in 1974. This argument is based on our decision in *Morville House, Inc.* v. *Commissioner of Corps. & Taxation*, 369 Mass. 928 (1976). In that case we held that Federal interest reduction subsidies received pursuant to the National Housing Act, 12 U.S.C. §§ 1715z-1(a)-(e) (1970), are not income for purposes of G. L. c. 121A, § 10. Pequot filed its excise returns for 1974 and 1975 prior to that decision, and Pequot now argues that some or all of its 1974 income may have consisted of Federal subsidies. We regard this argument as disingenuous, since Pequot had the opportunity to introduce evidence to this effect before the board, but declined to do so. Moreover, the developer of such a project begins to receive Federal interest subsidies when the project becomes habitable. See 24 C.F.R. § 236.501 (1972). In our view of the present cases, the receipt of Federal interest reduction subsidies in 1974 would be further evidence of completion.

Pequot reported $982,206 in gross income for 1975—considerably more than the previous year—and Pequot's second argument seems to be that this raises an inference that the project was completed in 1975, rather than in 1974. Clearly, the inference Pequot suggests is warranted by the evidence, but it does not follow that the board's

decision to the contrary is unsupported by substantial evidence. The board was free to disbelieve the inference urged by Pequot and to believe evidence to the contrary.

There is no error in the board's decision that Pequot's excise tax liability for 1974 and 1975 is based on a maximum fair cash value of $3,770,000.

2. *Contractual Liability.*

As outlined above the contract between Pequot and the city contains two formulas for determining the amount of Pequot's annual payments—one which is applicable "during construction," and one which is applicable "upon completion." The board found that, since completion had occurred in 1974, the applicable formula for 1974 and 1975 was the second one. We affirm this decision as to 1975, but reverse as to 1974.

Pequot argues, first, that "completion" was agreed to mean the date on which the MHFA issued its certificate of acceptance and approval. Pequot further argues that, under the contract, the project was considered to be "under construction" until the end of the calendar year in which completion occurred. Pequot asserts that "completion" occurred in 1975, and that, as a result, the project must be considered—for contract purposes—to have been "under construction" throughout 1974 and 1975.

The contract entered into on July 12, 1972, uses the word "completion" without giving it a special definition. The definition that Pequot wants to apply is found in the construction loan agreement between Pequot and MHFA. The city was not a party to that agreement. The contract between Pequot and the city mentions the MHFA, acknowledging it as lender, but the contract does not incorporate the construction loan agreement by reference, and it does not make reference to the MHFA's special definition of "completion." Pequot argued below that the parties must have contemplated using the MHFA definition of completion in their contract because it is customary, Pequot asserts, for all participants in an urban redevelopment project to defer to the lender's defini-

tion of "completion," for the sake of uniformity. The board heard testimony that the Department of Community Affairs, at least, customarily adopts the lender's definition of completion.

Pequot also argues, in effect, that the city agreed to add the MHFA definition of "completion" as a term of the contract almost two years after the contract had been entered into. A dispute arose in 1974 concerning Pequot's obligation to pay, and on May 14, 1974, Pequot sent an offer of settlement to the city solicitor. Pequot proposed to pay $21,000 when the city accepted the offer and $21,-560 "upon the completion of the building in the project, as evidenced by the issuance by the Massachusetts Housing Finance Agency of its Certificate of Approval and Acceptance." The city accepted this offer.

The board ruled, that, in its opinion, Pequot's arguments were without merit, that the MHFA definition of completion was not within the contemplation of the parties, and that "completion" for contract purposes occurred in 1974. "The decision of the board shall be final as to findings of fact." G. L. c. 58A, § 13, as amended through St. 1976, c. 415, § 3. We hold that a reasonable person might reach the same conclusion the board reached based on the evidence before it. See G. L. c. 30A, § 1(6).

The board erred in its reading of the contract, however. Pequot and the city agreed that the "during construction" formula in the contract would control in each calendar year "prior to *and including* the calendar year in which the building . . . shall be completed" (emphasis supplied). Completion occurred in 1974, and it follows that Pequot's contractual liability for that year is governed by the agreed valuation of $300,000, rather than the $3,770,-000 valuation found to be applicable by the board. There is no error, however, in the board's application of the "upon completion" formula to calendar year 1975.

3. *Parties to This Appeal.*

The State Tax Commission (commission) named as an appellee argues that it is not a necessary party to these proceedings and asks that the appeal be dismissed as to the commission. This request is allowed.

The controversy here is between Pequot and the city. Although the urban redevelopment excise is payable to the Commonwealth, the funds thereby collected are paid over to the city or town in which the project is located. See *Belt Realty Corp.* v. *State Tax Comm'n,* 363 Mass. 52, 53 (1973); *Opinion of the Justices,* 334 Mass. 760, 761-762 (1956). Pequot sought no relief against the commission, cf. *Morville House, Inc.* v. *Commissioner of Corps. & Taxation,* 369 Mass. 928 (1976), and the commission, although named as a party, did not participate in the hearing below. The commission has no stake in the outcome, since state revenues will not be affected, nor do the cases present any substantial question concerning the administration of the State tax system. Pequot does not challenge any action taken by the commission, see *Belt Realty Corp.* v. *State Tax Comm'n,* 363 Mass. 52 (1973), and the commission has no special expertise in urban redevelopment or housing matters which might aid this court in its deliberations. There is no actual controversy between the commission and the other parties to these appeals, and we conclude, therefore, that the commission is not a necessary party. Cf. *Massachusetts Mut. Life Ins. Co.* v. *Commissioner of Corps. & Taxation,* 363 Mass. 685, 689 (1973).

In so far as the board held that Pequot's contractual liability for 1974 was governed by the "upon completion" part of the contract, its decision is reversed and the case is remanded to the board. The board's ruling as to Pequot's contractual liability for 1975 and Pequot's excise liability for both years are affirmed.

*So ordered.*