NASHAWENA TRUST *vs.* BOARD OF ASSESSORS OF GOSNOLD.

Suffolk. October 9, 1986. — December 17, 1986.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Constitutional Law*, Standing to question constitutionality. *Taxation*, Real estate tax: agricultural and horticultural land.

A town's board of assessors had no standing to raise the question of the constitutionality of G. L. c. 61A, § 4, upon an appeal by the board from a decision of the Appellate Tax Board which held that certain lands owned by a trust were "actively devoted to agricultural use" or contiguous thereto and thus were correctly classified for tax purposes under c. 61A. [823-824]

In a proceeding to determine whether certain lands on Nashawena Island owned by a trust were "actively devoted to agricultural use" or contiguous thereto and thus were correctly classified for tax purposes under G. L. c. 61A, the Appellate Tax Board's finding that the land claimed in the trust's applications to be in agricultural use was the area on the island which was actually being used "primarily and directly" for agricultural purposes under c. 61A, § 1, was supported by substantial evidence. [824-826]

In a proceeding to determine whether certain lands owned by a trust were "actively devoted to agricultural use" or contiguous thereto and thus were correctly classified for tax purposes under G. L. c. 61A, the Appellate Tax Board correctly applied the formula for determining the minimum revenue requirements of c. 61A, § 3, by dividing the trust's income from agricultural use by the number of acres classified as "primarily and directly used" for agricultural purposes under c. 61A, § 1, and by excluding from the formula the contiguous lands which were found unsuitable or only marginally suitable for such use. [826-827]

In a proceeding to determine whether certain lands owned by a trust were "actively devoted to agricultural use" or contiguous thereto and thus were correctly classified for tax purposes under G. L. c. 61A, the Appellate Tax Board, in determining the minimum revenue requirements of c. 61A, § 3, correctly included within the gross sales under § 3, the revenues derived from the trust's slaughtering activities on the lands although such slaughtering, when undertaken, concededly was in violation of c. 94, § 120, c. 111, § 151, and 105 Code Mass. Regs. § 531 (1978), inasmuch as the revenues from slaughtering had been derived "in the regular course of business" within the meaning of c. 61A, §§ 1 and 3. [827-828]

APPEAL from a decision of the Appellate Tax Board.

*Daniel C. Perry (James M. Cronin* with him) for Board of Assessors of Gosnold.

*Casimir de Rham, Jr. (Malcolm L. Davidson* with him) for the taxpayer.

HENNESSEY, C.J. The board of assessors of Gosnold (assessors) appeals from a decision of the Appellate Tax Board (board) which held that certain lands owned by the Nashawena Trust (trust) were "actively devoted to agricultural use" or contiguous thereto and thus were correctly classified for tax purposes under G. L. c. 61A. We affirm the decision of the board.

The land in question is part of Nashawena Island, one of the Elizabeth Islands, located between Buzzards Bay and Vineyard Sound. The island consists of approximately 1,800 acres of land. The trust, which owns the island, maintains a small farming operation on the island which includes sheep, pigs, milk and beef cows, and chickens. For fiscal year 1984, the trust applied to the assessors to classify 630 acres of land on Nashawena as actively devoted to agricultural use under G. L. c. 61A, § 1.[1] For fiscal year 1985, the trust sought the same classification for 645 acres. In each year, the trust also sought to classify an equal amount of land as "contiguous land . . . not committed to residential, industrial or commercial use" under G. L. c. 61A, § 4.[2] In support of its application, the

_____

[1] General Laws c. 61A, § 1 (1984 ed.), provides: "Land shall be deemed to be in agricultural use when primarily and directly used in raising animals, including, but not limited to, dairy cattle, beef cattle, poultry, sheep, swine, horses, ponies, mules, goats, bees and fur-bearing animals, for the purpose of selling such animals or a product derived from such animals in the regular course of business; or when primarily and directly used in a related manner which is incidental thereto and represents a customary and necessary use in raising such animals and preparing them or the products derived therefrom for market."

[2] General Laws c. 61A, § 4, as in effect during the time periods relevant to this case, provided: "For general property tax purposes, the value of land, not less than five acres in area, which is actively devoted to agricultural, horticultural or agricultural and horticultural uses during the tax year in issue and has been so devoted for at least the two immediately preceding tax years, shall, upon application of the owner of such land and approval

trust produced evidence that, during the calendar years 1980-1983, the farming operations of the trust had revenues ranging between $4,348 and $5,269.[3] These totals included sums derived from animals that were butchered on Nashawena Island and sold to the beneficial shareholders of the trust, employees of the trust, and other residents of Gosnold. This slaughtering activity was carried on without securing permits required from the Department of Public Health and the selectmen of Gosnold under G. L. c. 94, § 120, c. 111, § 151, and 105 Code Mass. Regs. § 531 (1978). The applications for both years were denied by the assessors. The trust then filed petitions with the board under G. L. c. 61A, § 19, and, after hearings, the board entered a decision for the trust allowing the applications for classification under G. L. c. 61A in each case. The assessors then filed a claim of appeal to this court.

1. The assessors contend that the applications were properly denied because G. L. c. 61A, § 4, which extends the classification of "land . . . which is actively devoted to agricultural . . . uses" to include "such contiguous land under the same ownership as is not committed to residential, industrial or commercial use" exceeds the authorization of art. 99 of the Amend-

---

thereof, be that value which such land has for agricultural or horticultural purposes. For the said tax purposes, land so devoted shall be deemed to include such contiguous land under the same ownership as is not committed to residential, industrial or commercial use and which is covered by application submitted pursuant to section six. Land shall be deemed contiguous if it is separated from other land under the same ownership only by a public or private way or waterway.

"Land under the same ownership shall be deemed contiguous if it is connected to other land under the same ownership by an easement for water supply. Such contiguous land shall not exceed in acreage one hundred per cent of the acreage which is actively devoted to agricultural, horticultural or agricultural and horticultural uses.

"The rate of tax applicable to such agricultural or horticultural land shall be the rate determined to be applicable to class three, commercial property under chapter fifty-nine."

[3] The board found gross sales revenues during this period to be $4,802 in 1980, $4,937 in 1981, $5,269 in 1982, and $4,348 in 1983. Revenues raised from slaughtering of animals on the island were $804 in 1980, $1,019 in 1981, and $1,900 in 1982. After 1982, slaughtering activities on the island were discontinued.

ments to the Constitution of the Commonwealth.[4] Specifically, the assessors cite the requirement of art. 99 that "no parcel of land . . . which has not been actively devoted to agricultural or horticultural uses for the two years preceding the tax year shall be valued at less than fair market value under this article." The assessors claim that G. L. c. 61A, § 4, departs from this requirement because, as interpreted by the board, land failing to meet this requirement may still be classified as agricultural if it meets the further requirements of § 4.

We need not address this contention, however, because the assessors lack standing to raise such a claim. *Assessors of Haverhill* v. *New England Tel. & Tel. Co.*, 332 Mass. 357, 362 (1955). In that case, this court stated that "[i]n general an administrative officer cannot refuse to proceed in accordance with statutes because he believes them to be unconstitutional. . . . He must leave that issue to be raised by the persons who are adversely affected" (citations omitted). This is not a case in which relief is sought by the assessors "in interpreting the statutes applicable to their duties as to which a controversy has arisen." *School Comm. of New Bedford* v. *Commissioner of Educ.*, 349 Mass. 410, 412 (1965). See, e.g., *Wachusett Regional School Dist. Comm.* v. *Erickson*, 353 Mass. 77, 79 (1967).

2. The assessors next argue that, because the sheep were free to wander over the entire island to forage, the amount of land actually involved in "active" agricultural use was greater than that claimed by the trust in its applications. The assessors claim that the method used to determine the amount of land in agricultural use was not based on the actual use of the land but on some designation of the land's "suitability" for agricultural use. The board found "sufficient basis in the evidence

---

[4] Article 99 provides: "Full power and authority are hereby given and granted to the general court to prescribe, for the purpose of developing and conserving agricultural or horticultural lands, that such lands shall be valued, for the purpose of taxation, according to their agricultural or horticultural uses; provided, however, that no parcel of land which is less than five acres in area or which has not been actively devoted to agricultural or horticultural uses for the two years preceding the tax year shall be valued at less than fair market value under this article."

presented for distinguishing land whose principal use was as a source of forage for sheep from land which was unsuitable or only marginally suitable for that purpose, and which may contribute more to recreational and general conservation uses." Based on this finding, the board ruled that the land claimed in the trust's applications to be in agricultural use was the area on Nashawena Island which was actually being used "primarily and directly" for agricultural purposes under G. L. c. 61A, § 1.

We limit ourselves in our review of this question to a determination whether the decision of the board is supported by substantial evidence. *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 465-466 (1981), and cases cited. "We have frequently stated that substantial evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* at 466. G. L. c. 30A, § 1. Furthermore, "[o]ur determination must be made 'upon consideration of the entire record.'" *New Boston Garden Corp.* v. *Assessors of Boston, supra* at 466. G. L. c. 30A, § 14. In this case, we conclude that the board's decision meets this requirement. Considerable testimony was introduced in the hearings before the board that the land included in the applications was the land on the island "primarily and directly used" by the farming operations of the trust for agricultural purposes. The manager of the farm for the trust determined the extent of the land to be included in the application for 1984 by excluding the shoreline, dunes, swampy forest, dense scrubland, and low-brush scrubland with minimal grass from the total area of the island. She concluded that the remaining land was the land primarily used by the sheep for grazing. This determination was further substantiated by a report prepared by the county agent for the Soil Conservation Service of the United States Department of Agriculture, which included a "land use inventory." This inventory listed a total of 635 acres of "pasture," "planned pasture," and "native pasture" on the island. This figure, plus the addition of ten acres for farmstead and farm ponds, resulted in the figures used on the 1985 application. Although the assessors presented evidence that grazing occurred on other areas of the island not included in the application,

the board was not unwarranted in its findings that the applications properly identified the extent of land "primarily and directly used" for agricultural purposes.

3. Finally, the assessors present two arguments that the applications were properly denied under the minimum revenue requirements of G. L. c. 61A, § 3.[5] Under § 3, gross sales from agricultural land in excess of five acres must be not less than five hundred dollars plus five dollars per acre over five acres. The assessors first argue that the formula of § 3 is a measure of the intensity of use. Consequently, the formula must be applied by "dividing income from agricultural use by not less than the entire amount of land used to generate the income." Because the sheep forage over the entire island, the assessors argue that the board erred in only applying the formula to the land classified as "primarily and directly used" for agricultural purposes under G. L. c. 61A, § 1. In other words, the assessors contend that contiguous lands under G. L. c. 61A, § 1, must also be included in determining the revenue requirements under G. L. c. 61A, § 3. We disagree.

As stated by the board: "[T]he statement that land actively devoted to agricultural uses shall be deemed to include certain contiguous land must be interpreted as limited to the treatment provided in Section 4. Section 4 begins with the phrase 'For general property tax purposes', and the contiguous land provision expressly refers to this phrase ('For the said tax purposes

---

[5] General Laws c. 61A, § 3 (1984 ed.), provides: "Land not less than five acres in area shall be deemed to be actively devoted to agricultural or horticultural uses when the gross sales of agricultural, horticultural or agricultural and horticultural products resulting from such uses together with the amount, if any, payable under a soil conservation or pollution abatement program of the federal government or the commonwealth total not less than five hundred dollars per year or when the use of such land is clearly proven to be for the purpose of achieving an annual total of not less than five hundred dollars from such gross sales and program payments within normal product development period as determined by the farmland valuation advisory commission established pursuant to section eleven of this chapter. In cases where the land is more than five acres in area, the gross sales and program payment standard above set forth shall be increased at the rate of five dollars per acre except in the case of woodland or wetland for which such increase shall be at the rate of fifty cents per acre."

. . .') as a limit on the scope of its application. The structure of Section 4 implies that land designated as contiguous is land which would not otherwise qualify as actively devoted to agricultural uses, precisely because it produces little or no income. To require inclusion of revenues from such land in determining the amount of the gross sales requirement would defeat the purpose of giving agricultural value treatment to contiguous land, and in so doing, defeat the purpose of the entire statute. . . . The statutory structure suggests that land actively devoted to agriculture should be limited to land primarily and directly used in agriculture."

The assessors' second argument challenges the decision of the board which included within the gross sales under G. L. c. 61A, § 3, the revenues derived from the slaughtering activities on the island which were in violation of G. L. c. 94, § 120, c. 111, § 151, and 105 Code Mass. Regs. § 531 (1978). If the revenues derived from these activities are deducted from the gross revenues from the other farming operations, the gross sales in calendar year 1982 would fall below the statutory requirement of § 3. Based on this argument, both applications would be properly denied under the requirements of G. L. c. 61A, § 4, that land, to be actively devoted to agricultural uses, must have been so devoted "for at least the two immediately preceding tax years." We disagree.

Under G. L. c. 61A, §§ 1 and 3, gross sales must be derived from sales in the regular course of business. The statute makes no exception for sales resulting from an illegal activity. We hesitate to infer such an exception when the enforcement of the statutes and regulations has already been provided for by the Legislature. See, e.g., G. L. c. 111, § 152. Furthermore, the board found that the selectmen of Gosnold took no action to enforce G. L. c. 111 in this instance, and the trust halted all slaughtering activities upon learning of the statute. We agree with the board that, despite the failure of the trust to secure the necessary permits for its slaughtering activities, revenues derived from these activities were "in the regular course of business." We also agree that sales to the shareholders of the trust and its employees were in the regular course of

business. See *Jaquith* v. *Davenport*, 197 Mass. 397, 403 (1908); *Nary* v. *Merrill*, 8 Allen 451, 453 (1864). No suggestion was made that any of these sales were for less than market prices. The board found that the trust was "engaged in a regular business of selling animal products to local buyers, whether for personal consumption or resale, and that sales to individuals were sales in the regular course of business."

The decision of the Appellate Tax Board is affirmed.

*So ordered.*