CITY OF GLOUCESTER vs. CIVIL SERVICE COMMISSION &
others.[1]

Essex. April 4, 1990. - August 13, 1990.

Present: LIACOS, C.J., WILKINS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Practice, Civil,* Review respecting civil service. *Civil Service,* Decision of
Civil Service Commission, Termination of employment, Judicial review,
Municipal finance. *Municipal Corporations,* Municipal finance. *Admin-
istrative Law,* Substantial evidence, Judicial review.

On appeal by the city of Gloucester from a decision of the Civil Service
Commission requiring the city to reinstate a tenured civil service em-
ployee who had been terminated due to "lack of money, as caused by
budgetary restraints" from his position as a junior draftsman in the
city's department of public works, this court concluded from its review
of the administrative record that the commission's decision requiring
reinstatement constituted a substantial error of law affecting material
rights of the parties, and that just cause for the employee's separation
from employment had been established. [297-301]

CIVIL ACTION commenced in the Superior Court Depart-
ment on August 6, 1986.

The case was heard by *Robert W. Banks,* J., on motions
for summary judgment.

The Supreme Judicial Court on its own initiative trans-
ferred the case from the Appeals Court.

*Linda Thomas Lowe,* City Solicitor, for the plaintiff.

*George Ross Sibley* for Jack D'Antonio.

*Judith Fabricant,* Assistant Attorney General, for the
Civil Service Commission, was present but did not argue.

O'CONNOR, J. This is an appeal by the city of Gloucester
from a grant of summary judgment for the defendants. The

---

[1]The individual members of the Civil Service Commission and Jack
D'Antonio.

judgment affirmed an order of the Civil Service Commission (commission) requiring the city to reinstate the defendant D'Antonio to his employment as a junior draftsman in the city's department of public works (DPW). Because we hold that D'Antonio's separation from employment was proper, we reverse the summary judgment for the defendants and remand this case to the Superior Court for the entry of an order reversing the commission's order.

The following facts are taken from the subsidiary findings of the administrative magistrate who was designated by the commission to hear D'Antonio's appeal under G. L. c. 31, §§ 42 and 43 (1988 ed.). D'Antonio was a junior draftsman, a grade 6 position, in the engineering division of the city's DPW. D'Antonio, a disabled veteran, was a tenured employee and was entitled to the protection of the civil service law, G. L. c. 31 (1988 ed.). In early 1985, the director of the DPW, Edward S. Parks, Jr., submitted a proposed budget for fiscal year 1986 to the mayor, which included funding for D'Antonio's position as junior draftsman. Subsequently, the mayor informed Parks and the heads of the other city departments that the proposed city budget exceeded anticipated revenues and that the proposed budget would have to be reduced by $433,447.

The mayor instructed Parks to reduce the DPW budget by $25,000. Parks recommended that a cut of approximately $18,000 be achieved by eliminating the funding for the junior draftsman position in the engineering division. The mayor accepted that recommendation and submitted a budget to the city council that contained no appropriation for D'Antonio's job. A position in the purchasing department was the only other position which was filled at that time and was unfunded in the fiscal year 1986 budget submitted to the city council.

The council approved the recommended budget. The appropriation for the DPW for fiscal year 1986 was $578,821 more than had been appropriated for fiscal year 1985. In addition, despite the elimination of funding for the junior

draftsman position, the appropriation for permanent personnel in the engineering division for fiscal year 1986 was $12,539 more than for fiscal year 1985. Included in the 1986 figure was funding for two new positions for the engineering division, bringing to six the number of funded positions in that division. In addition to the new positions of assistant city engineer (grade 12) and administrative assistant to the engineer (grade 10), the funded positions in the engineering division were engineer, senior engineering aide (grade 6A), principal clerk, and clerk.

D'Antonio received formal notice that he would be separated from his employment as of July 1, 1985, and that the reason for the separation was "lack of money, as caused by budgetary constraints." See G. L. c. 31, § 39 (1988 ed.). As a result of a hearing conducted by the city as appointing authority pursuant to G. L. c. 31, § 41 (1988 ed.), the city determined that D'Antonio's layoff was lawful. D'Antonio was offered three other grade 5 or grade 6 positions, which he turned down because of his physical limitations, and was interviewed for a fourth position, junior engineering aide, a grade 6 position, for which the DPW found him unqualified. The magistrate found that the junior draftsman (D'Antonio's position) and junior engineering aide positions were dissimilar "inasmuch as the latter position requires field work such as setting grade stakes, acting as rod man and inspecting construction projects."

D'Antonio appealed from the city's decision to the commission pursuant to G. L. c. 31, §§ 42 and 43. That led to the administrative magistrate's hearing, her subsidiary findings which we have set forth in relevant part above, and the magistrate's conclusions and recommendations with respect to D'Antonio's G. L. c. 31, §§ 42 and 43 claims. The magistrate recommended that the commission deny D'Antonio's § 42 claim, and the commission did so. That claim is not involved in this appeal. Below, we set forth in some detail the magistrate's conclusions with respect to the § 43 claim.

The magistrate concluded that, although DPW director Parks contended that the budget reduction accomplished by

laying off D'Antonio was necessitated by lack of money, "the D.P.W.'s FY '86 budget shows otherwise." The magistrate reasoned that the final salary appropriations for DPW personnel totalled $323,765 more in fiscal year 1986 than in fiscal year 1985, and that, even if $192,000 of this amount is attributable to a union-negotiated wage increase, as Park testified, the balance was "clearly enough of a margin to retain [D'Antonio] at an $18,168 annual salary." The magistrate also pointed out that the total appropriation for the engineering division for fiscal year 1986 was $11,440 more than for fiscal year 1985, and the amount appropriated for permanent positions in the engineering division in fiscal year 1986 exceeded the amount appropriated in fiscal year 1985 by $12,539. "These figures," the magistrate concluded, "demonstrate that, although there was a finite limit to D.P.W. funds, there were adequate monies to retain [D'Antonio]."

"Moreover," the magistrate observed, "in the engineering division, the D.P.W. Director increased the staff from an Engineer, Senior Engineering Aide and junior draftsman (Gr 6) to the same positions minus the junior draftsman position, plus an administrative assistant to the engineer, grade 10, assistant city engineer, grade 12, and advertised for a junior engineering aide, grade 6. Furthermore, while D.P.W. now claims that it had a lack of funds in spring 1985, it advertised in April 1985 for a Junior Engineering Aide for the engineering division just at the same time it was in the process of laying [D'Antonio] off for lack of funds."

The magistrate made two more points in concluding that D'Antonio's separation from employment was not due to lack of funds: the proposed budget for fiscal year 1986 lists the DPW as employing the same number of persons as in the previous year, and "Director Parks offered [D'Antonio] the vacant maintenance and custodial positions, which indicates that Parks had the funds available and was willing to spend the amount of salary for these positions."

In summary, the administrative magistrate stated: "I do not find that D.P.W. Director Parks acted in bad faith, but rather out of inadvertence. Nonetheless, I conclude that the 'lack of funds' claim to be a pretext, device and means by which to free the D.P.W. of [D'Antonio's] services, based upon Parks' repeated statements that [D'Antonio] was able to do little other than drafting and that Parks wanted [D'Antonio] no longer employed by the Department. . . . [T]he Appointing Authority has failed to sustain its burden of proving that the additional funds appropriated for FY 1986 were for needs more pressing than retaining a 15 year tenured civil servant."

The magistrate recommended to the commission that it "reverse the action of the Appointing Authority and restore [D'Antonio] to his position of junior draftsman without loss of compensation or other rights." The commission adopted the magistrate's findings, set aside the action of the city, and ordered that D'Antonio be reinstated with back pay. The commission stated in its decision that "the appointing authority [had] failed to prove just cause in laying-off [D'Antonio] for a lack of funds," and repeated the magistrate's conclusion that the reason given by the appointing authority was "a pretext or device to get 'rid of' the employee for some other cause." On reconsideration, the commission reaffirmed its position.

The city brought this action in the nature of certiorari for judicial review of the commission's decision pursuant to G. L. c. 249, § 4 (1988 ed.). See *Debnam* v. *Belmont*, 388 Mass. 632, 634 (1983). The city and D'Antonio each moved for summary judgment. A judge allowed D'Antonio's motion and denied the city's motion. The commission then moved for summary judgment and its motion was allowed. The city appealed from the judgment for the defendants.

Before proceeding to the substantive issues, we make an observation concerning the procedure invoked by the parties in this case. Summary judgment procedure is appropriate to raise the question whether there is a triable factual dispute. A motion for summary judgment first raises the question

whether there is a genuine issue of material fact, and then, if there is not, whether the moving party is entitled to judgment as a matter of law. Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). Review under G. L. c. 249, § 4, is limited to correcting "substantial errors of law that affect material rights and are apparent on the record." *Debnam* v. *Belmont*, *supra* at 635. *Curley* v. *Lynn, ante* 39, 40 (1990). Since review is confined to the record and is for the purpose of correcting legal error, the inquiry about the presence or absence of genuine issues of material fact, germane to summary judgment procedure, is inappropriate. Therefore, we need not be concerned with summary judgment principles. We need only inquire whether the commission's decision was "legally tenable and supported by substantial evidence on the record as a whole." *Commissioner of Health & Hosps. of Boston* v. *Civil Serv. Comm'n,* 23 Mass. App. Ct. 410, 411 (1987). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6) (1988 ed.). *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. 456, 466 (1981). The question for the judge in the Superior Court was, and for us is, whether, on the basis of the transcript of evidence before the administrative magistrate and the magistrate's findings and conclusions, the commission substantially erred in a way that materially affected the rights of the parties. If such error occurred, judicial correction is required.

Chapter 31, § 41, restricts the ability of an appointing authority to remove a tenured civil service employee. An employee cannot be laid off except for "just cause." The commission's task is to determine, after a hearing, whether the appointing authority has sustained its burden of proving by a fair preponderance of the evidence that there was just cause for the action it took. *Fire Comm'r of Boston* v. *Joseph,* 23 Mass. App. Ct. 76, 77, 81-82 (1986). In attempting to show just cause, the appointing authority can rely only on those reasons for layoff that it gave to the employee in writing, here, lack of money. See G. L. c. 31, § 41. *Murray* v. *Second Dist. Court of E. Middlesex,* 389 Mass. 508, 516 (1983).

Lack of money can constitute just cause. *Debnam* v. *Belmont, supra* at 634.

The magistrate and the commission concluded that, despite the city's claim to the contrary, the city did not lack funds with which to pay a junior draftsman's salary, and the claim of lack of funds was but "a pretext, device and means by which to free the D.P.W. of [D'Antonio's] services, based upon [Director] Parks' repeated statements that [D'Antonio] was able to do little other than drafting and that Parks wanted [D'Antonio] no longer employed by the Department." It is clear from the magistrate's report to the commission that her conclusion that the city did not lack funds was based on her expressed subsidiary findings. The further conclusion that the claim of lack of funds was only a pretext to free the DPW of D'Antonio's services appears to have been based at least in part on the conclusion that the city did not lack funds (and therefore on the subsidiary findings) but it may also have been based in part directly on the evidence before the magistrate. To the extent that that conclusion was based directly on the evidence, the conclusion was not supported by substantial evidence and therefore cannot stand. There was no evidence that Parks was dissatisfied with D'Antonio, or that he no longer wanted D'Antonio employed by the DPW or had ever made a statement to that effect. Parks, according to the magistrate's findings, offered D'Antonio three other positions in the DPW, which D'Antonio turned down, and D'Antonio was interviewed for a fourth, but dissimilar, position for which the DPW found him to be unqualified. There was no evidence that the DPW's finding in that regard was unjustified. Furthermore, there was no evidence that, after D'Antonio was laid off, someone else was assigned the same tasks under the same or a different job description. On the contrary, Parks testified on cross-examination, in response to an inquiry as to whether, following the layoff, the junior draftsman's "workload [was] still there," that the workload was still there but that a full-time draftsman was not needed to do it. In response to the magistrate's question, "What do you do about

drafting now?", Parks explained as follows: "You don't; you just leave it there. The primary thing there which had to be done, is the update of the map. The senior engineering aide would update the map. But after a point in time if there are a lot of real estate transactions or whatever, in that particular area of the city which pertain to a particular assessors map you have a lot of updates all over it. Then you would finally pass it to the draftsperson and say, 'Take all these updates of this map and incorporate them into the map,' in drafting the lines and changing the lines and whatnot on the map. So, right now the maps are being updated, yes. But they are not being redrafted to make a nice, new, clean map to work with, with no update notes on them. That can go on for whatever. You may have a sloppy map, but - -." The clear import of Parks's uncontradicted testimony was that the production of a junior draftsman was not essential. Nothing in Parks's testimony or elsewhere in the evidence suggested that Parks wanted to get "rid of" D'Antonio.

We come, then, to the question whether the magistrate's subsidiary findings warranted her conclusion, adopted by the commission, that the city did not lack funds with which to pay the salary of a junior draftsman. It is important that it be clear what the term "lack of funds" in the context of this case means. Obviously, if the city had ignored competing demands for its funds, it would have had enough money to pay the salary of a junior draftsman in fiscal year 1986. But, as we said in *Debnam* v. *Belmont*, *supra* at 635, "when a municipality makes a good faith nonarbitrary determination that its revenues will be less than was anticipated when the tax rate was set, thereby jeopardizing the town's ability to meet its total appropriation, there is a lack of money within the meaning of G. L. c. 31, § 41." It is clear from the magistrate's subsidiary findings that the city was confronted with a revenue shortfall of $433,447. Therefore, the city experienced a "lack of funds" requiring budget cuts. Surely, in the absence of pretext or device designed to defeat the civil service law's objective of protecting efficient public employees from partisan political control, see *Debnam* v. *Belmont*,

*supra* at 635, or to accomplish a similar unlawful purpose, ·
the judgment of municipal officials in setting the municipal-
ity's priorities and in identifying the goods and services that
are affordable and those that are not cannot be subject to the
commission's veto.[2] This court and the Appeals Court have
effectively and repeatedly said so in the past. See *School
Comm. of Salem* v. *Civil Serv. Comm'n,* 348 Mass. 696,
698-699 (1965); *Murphy* v. *Third Dist. Court of E. Middle-
sex,* 316 Mass. 663, 667 (1944); *McNeil* v. *Mayor of
Peabody,* 297 Mass. 499, 503-504 (1937); *McCabe* v. *Judge
of the Dist. Court of Lowell,* 277 Mass. 55, 57-58 (1931);
*Yunitz* v. *Chelsea,* 270 Mass. 179, 181 (1930); *Gardner* v.
*Lowell,* 221 Mass. 150, 154 (1915); *Commissioner of Health
& Hosps.* v. *Civil Serv. Comm'n,* 23 Mass. App. Ct. 410,
413 (1987); *Whalen* v. *Holyoke,* 13 Mass. App. Ct. 446,
453-454 (1982).

The defendants focus, as did the magistrate, on the facts
that the total city budget, the appropriation for the DPW,
and the appropriation for permanent personnel in the engi-
neering division were increased in fiscal year 1986 over the
fiscal year 1985 figures, and that for fiscal year 1986 two
new positions, very different from junior draftsman, were
created. However, these facts neither require nor warrant a

---

[2]The magistrate's erroneous perception of the commission's and her
function is revealed by the following comments made by the magistrate
during the hearing she conducted: "It's a tough thing for [the] Appointing
Authority. You all make your decisions, and we really do have to sort of
look into it and make the decision of whether we think it's appropriate. In
a way I feel that it's none of [our] business. You guys have to do your job.
But in terms of protecting Mr. D'Antonio, we have to look at that and
decide whether this is an appropriate cut to make. Whether it would have
been more important or more appropriate to cut - add more - cut say a
boat marine repair, just picking the first thing I look at; for example, it's a
tough thing for us to do, knowing very little about what happens in the
City of Gloucester government. But that is what I and they (Civil Service
Commission) will be called upon to do. So, in that respect I think we have
to have the budget and we really need an explanation of why Mr.
D'Antonio, as opposed to Mr. Jones in some other department. That's why
I've had Mr. Zagger [the administrative assistant to the mayor of Glouces-
ter, a prior witness] go through the cuts, and Mr. Parks will explain the
particular decision with regard to the position."

conclusion that the lack of funding of the junior draftsman position was attributable to anything other than the city's determination that "anticipated revenues [would] be inadequate to pay the employee's salary as well as to meet other more pressing municipal needs." See *Debnam* v. *Belmont*, *supra* at 636. It follows that D'Antonio's layoff was due to "lack of money, as caused by budgetary constraints," as specified in the city's termination notice to him.[3]

We conclude from our review of the administrative record that the commission's decision requiring the city to reinstate D'Antonio constituted a substantial error of law affecting material rights of the parties, and that just cause for D'Antonio's separation from employment has been established. Accordingly, we reverse the judgment entered in the Superior Court and remand this case to that court for the entry of an order reversing the action of the commission.

*So ordered.*

---

[3]Parks testified that the positions in the engineering division were different in fiscal year 1986 from what they were in fiscal year 1985. He testified that the engineering division had "changed quite a bit. It's changed because of the fact of mandates from the state on several engineering-type functions, monitoring, mandated surveys and whatnot. It's taken on a sort of different look." When asked by the magistrate how the primary job of the engineering division changed from fiscal year 1985 to fiscal year 1986, Parks answered: "It hasn't changed all that much with reference to engineering projects per se, it's a follow-on for engineering projects which were in the mill in FY-85, which have been carried forward and expanded — not in scope — but in the direction of which they were going. As an example; sewer projects were a big thing in '84 and '85 in closing them up. Now that has shifted from the installation into the ground into the monitoring of those systems that are in the ground, and the follow-through of those systems through the treatment plant right out to deposit into the ocean, where the outfall is."