Connon, Richard F., J.

INTRODUCTION

This is an appeal from a decision of the Barnstable Conservation Commission filed pursuant to G.L.c. 249, §4. On February 20th of 2003, the said Commission had denied the plaintiffs’ application for a permit to erect a pier on their property at 621 Old Post Road in the village of Cotuit, Barnstable, Massachusetts.

BACKGROUND

On September 19th, 2002 the plaintiffs filed a Notice of Intent with the Barnstable Conservation Commission (BCC). The project description was the construction of a fixed timber pier with ramp, float and lateral access stairs. The proposed project was in an area Bordering Vegetated Wetlands (BVW). It would not affect any of the state-listed rare wetlands wildlife, it was not in an Area of Critical Environmental Concern (ACEC), nor was the project subject to wetlands restrictions ordered under the Inland Wetlands Restriction Act (M.G.L.c. 131, §40A) or the Coastal Wetlands Restriction Act (M.G.L.c. 130, §105). The project is subject to Chapter 91 licensing. Initially the proposed construction would consist of treated piles with a ramp and float running off the end of the proposed fixed pier. The pier would extend 100 feet beyond the mean low water mark (MLW), with a total length of 121 feet. The lot owned by the plaintiffs is approximately 2.7 acres with 320 feet of frontage on Cotuit Bay. The entire shorefront has a revetment. The proposal would accommodate a vessel with a draft of 36 to 38 inches. Currently, the plaintiffs have a 35-foot Tiara vessel, which is on a mooring off of their property.
The proposed location of the pier on Cotuit Bay is at a point where the MLW width of the bay exceeds 1,500 feet and is several hundred feet from the marked navigation channel. In their application, the plaintiffs stated that, “There are few shellfish, and no marine grass bed would be in the proposed work area, and would have no significant adverse impact to the shellfish habitat.” The basis of this assertion was the results of a shellfish survey done on August 15th, 2002 by a Richard C. Nelson at the direction of the plaintiffs. The empirical data gathered was that in the proposed work area there were a total of 14 quahogs *346 in 13-square-yard sample plots; an average of 0.12 animals per square feet. According to the Town, on a ranking of one to ten, ten being the highest habitat, this area has been classified as a four. There were four administrative hearings on the Plantiffs’ application: October 22nd, 2002, December 10th, 2002, January 14th, 2003 and January 28th of 2003.
At the first meeting on October 22nd, 2002 there were a number of exhibits submitted, which included ten letters as well as an email voicing opposition to the proposed pier because of concerns for shellfish habitat. There were no letters opposing the project from the 12 abutters as taken from the Assessors Map 54. There was also a petition signed by approximately 40 individuals from various towns throughout the Cape, presumably shellfishermen, although there was no way to verify the fact that they are indeed shellfisher-men. The petition read, “We the undersigned shellfishermen and supporters would like to voice our opposition to the pier and dock construction to be located within and/or abutting the Cordwood Recreational Shellfishing Area.”
The chairman of the Commission read a letter from Thomas Marcotti, Deputy Shellfish Constable for the Town of Barnstable. Mr. Marcotti had done a survey at the proposed site on October 21st, 2002. The results of this survey was not unlike the results of the applicants’ survey. Mr. Marcotti’s survey revealed, “A population of various year classes of naturally occurring quahogs, as well as planted quahogs relayed to the area by Natural Resources.” The area of the proposed pier was a permitted area as determined by the Massachusetts Division of Marine Fisheries as a “shellfish relay area.” In 1995 the “Cordwood Lane Relay Area” received 1,246 (80 pounds) bushels of contaminated quahogs. There was some confusion whether the “Cordwood Lane Relay Area” encompasses the site of the proposed pier. The Town of Barnstable Natural Resources officer and the Mass. Division of Marine Fisheries consider the shellfish relay area significant shellfish habitats. Access to the proposed site by shellfisher-men to the barrier of the pier would be from Cord-wood Lane for the shellfishermen, be they commercial or recreational. A sampling of comments from those opposed to the project were: “The village of Cotuit has made it abundantly clear that it opposes all such piers on the grounds of safety of sailing, preservation of aesthetics and protection of shellfishing.” The Commission and the Town Counsel have instituted a ban of piers within the area of Cotuit. Another wrote, “These bays need protection for both public navigable waters on beachfront properties and shellfish beach fishing and public access are important to the rights and tradition of Cotuit.” “The adoption last year of a pier area by the Town Counsel demonstrates the sense of community on this pier topic.”
In response to some of the letters opposing the project, Arlene Wilson representing the applicants stated that the area was not mapped as a high priority area on the Marine Fisheries maps. The maps had been produced by the Town. Nor was it a high priority with the Town Department of Natural Resources.
There was some discussion about how far the project was from the relay area. Arlene Wilson stated that it was at least 400 feet away and 850 to 1000 feet away from the Cotuit Oyster Company. There are no other piers in the area. The first meeting concluded with the applicant requesting a continuance to get better information about the extent of the relay area. The Chairman Lancaster acknowledged that it would be of some use, “Although I’m not sure how much better that’s going to make us feel.”
At the second meeting, on December 10th, 2002 Arlene Wilson stated that the proposed pier had been re-designed, using aluminum gangways, so that the number of piles had been reduced from 24 to ten, and the number of piles in the near sub-tidal zone (below the low water line), from 20 to eight. The structure was also raised from 5.6 feet to 8.5 feet above mean low water. The new design would allow shellfishermen and small boats to maneuver under the pier, and the overall length of the pier was shortened by 12 feet. The purpose of the second meeting was to determine precisely where the relay shellfish area was. Chairman Lancaster read a letter from the Commonwealth of Mass. Division of Marine Fisheries to the Conservation Commission, which was dated November 27th, 2002. The letter in effect stated that the project was in an approved shellfish relay area which is managed by the Town as part of their shellfish propagation program. (The Town was not aware that this had been the case during its first meeting.) The letter went on to state that the Division of Marine Fisheries, after reviewing all available materials, determined that the project worksite lies within a significant habitat and is afforded protection under the Wetlands Protection Act (310 CMR, 10.34), and that its use as a shellfish propagation area will be compromised if the construction of a pier with its attendant use by boats is permitted. John Górecki, an opponent of the project, had submitted a letter voicing his opposition not only to the applicant’s project, but another project proposed by a party named Keally. His comments were not specific to the area of the proposed project but rather a general commentary on shellfish survival. Other comments came from recreational shellfisher-men who claimed, “The pier would have a negative impact on sailing and shellfishing and preservation of the aesthetics and beaches for current and future residents.” From the reading of the letters, review of the petitions and comments made at the two hearings, it’s reasonable to infer that most shellfishermen oppose piers no matter where they may be located. The most vocal opponents are recreational shellfishermen *347 and little has been heard from the commercial shellfishermen.
Both the applicant and the opponents as well as the Commission agree on one thing, that the area near the proposed pier has been licensed for relay purposes and that the last time it was used for such purpose was in 1995 when it received 1,246 bushels of contaminated quahogs. There is no evidence before the Commission that any contaminated shellfish had been placed there since 1995. One of Mr. Marcotti’s studies of the area to determine how good the habitat was revealed that the area was not getting any natural propagation. One cause of low productivity is the fine-grain clay settlements which bond pollutants. Shellfish settling in the area would be subject to higher pollutant levels which may contribute to the lack of natural propagation. There was some discussion regarding prop dredging, but that didn’t appear to be a major concern for the project.
At the January 14th, 2003 meeting, the Commission voted to deny the permit. The meeting started with comments from the Commission’s administrator Robert Gatewood stating, “Yeah, this is exactly next to the Keally pier. It is the next lot to the west of the Keally pier.”
Commissioner Albert Barbour stated, “This is a relay area or immediately adjacent to the relay area. I haven’t seen a map, but on the other hand drawing a line on a map usually doesn’t change habitat, so that I suspect that everything from Cordwood Lane all the way down to Cotuit Oyster is more or less the same habitat . . . It’s in a prime shellfish habitat area. The whole area is a prime shellfish habitat.”
Commissioner Peter Sampou stated, “Scientific evidence exists which shows apparently a deleterious effect on shellfish associated with docks, piers and boats in shallow waters. It’s in a state relay area and it’s pretty clear that we have directive from the state level to not allow a pier in such a place.”
Commissioner Robert Lancaster stated, “I find that this pier is in a shellfish habitat; that the applicant has made an effort to reduce the impact of this structure . . . but reducing it doesn’t eliminate it. This is going to have a detrimental effect on this resource.”
Commissioner Scott Blazis stated, “It is in a state approved shellfish relay area. The cumulative impacts appearing within this relay area make it hard for me to support it.”
Commissioner Walter Wannie stated, “I find it to be a significant area for shellfish and it creates problems for shellfishermen access and that it’s difficult to navigate boats in such a narrow area.”
Commissioner James Lane recommends denial for the interests of the shellfish habitat and public recreation.
On January 28th, 2003 the Commission issued their findings of fact regarding the proposed construction of the pier as follows.
1. The applicant proposed a pier 121 feet in length consisting of three sections 29 feet in length with a 23-foot ramp and an 8- by 16-foot float extending in all 100 feet from mean low water into Cotuit Bay. The applicant cited a suitable draft for the intended vessel at 36 to 38 inches.
2. The shellfish survey provided by the applicant’s expert found low standing stock (14 individuals) at the locus at the time of the survey. That conclusion is supported by the Town Shellfish Biologist, who conducted a shellfish survey there of his own.
3. The shellfishery at the locus is subjected to periodic commercial and recreational harvesting, rendering standing stock an ineffective measure of the productivity and importance of the shellfishery.
4. The Town Shellfish Biologist cited the “historical productive quality of the area within the proposed project footprint.”
5. The Town Shellfish Biologist and the Director of the Massachusetts Division of the Marine Fisheries both have indicated the project falls within a designated “Shellfish Relay Area.” Such areas are considered a significant shellfish habitat, and the subject relay area is important in providing quahogs for the Town’s recreational and commercial harvests.
6. The site is found significant under Mass. General Laws Chapter 131, Section 40 to the interest of protection of land containing shellfish, and significant under Article 27 of the Town of Barnstable General Ordinances to the interest of shellfish and recreation.
7. The Commission took testimony and correspondence from recreational shellfishermen who cited likely adverse impacts to the shellfishery should the project ensue.
8. The Director of the Massachusetts Division of Marine Fisheries stated that the locus “use as a shellfish propagation area will be compromised if the construction of a pier with its attendant use by boats is permitted.”
9. Article 27 of the Town of Barnstable General Ordinances regulates recreation, which it defines to include shellfishing.
10. Based on the testimony provided, the Commission finds it more likely than not that the proposed pier will inhibit and impede access to the shellfish-eiy by recreational shellfishermen.
11. Inhibiting and impeding access is found to pose a significant adverse impact to the recreation’s interest as protected by Article 27.
12. Moreover, because the locus is but one of approximately eight parcels without piers which *348 directly abut the existing Shellfish Relay Area, the commission finds that the project will have a significant cumulative impact upon the shellfishery as regulated under Article 27.
13. The Town of Barnstable Local Comprehensive Plan provides in strategy 2.2.3.3.1 that: “Construction or expansion of docks and piers shall not be permitted in significant shellfish habitat areas identified by the Division of Marine Fisheries and the local shellfish officials or in CRPAs.”
14. Section 4 of the Town of Barnstable Local Comprehensive Plan, which deals with contradictions between the LCP and local ordinance and regulations, states that “Boards and Commissions that have discretionary decision-making power may make reference to and use the Plan in support of their decisions to the extent that such reference and use is rationally and reasonably related to their decision in question.”
Decision: The proposed project is denied under Mass. General Laws Chapter 131, Section 40 in the interest of protection of land containing shellfish and under Article 27 of the Town of Barnstable General Ordinances in the interest of shellfish and recreation.
On November 17th, 2003 the Department of Environmental Protection, after an in-depth review and in accordance with M.G.L.c. 131, §40, and the Wetlands Regulation at 310 CMR 10, issued a superseding order of conditions approving the proposed pier, with access stairs, ramp and float.

DISCUSSION

The Superior Court review of an agency decision in the nature of certiori is limited to correcting substantial errors of law apparent on the record which adversely affect material rights. G.L.c. 249, §4. Carney v. Springfield, 403 Mass. 604, 605 (1995) (“A court will correct only a substantial error of law, evidenced by the record, which adversely affects a material right of the plaintiff’). In reviewing the decision of the Barn-stable Conservation Commission, this court may rectify only those errors of law which have resulted in manifest injustice to the plaintiff or which have adversely affected the real interests of the general public. What the court is required to do is review the record for the purpose of correcting legal errors. Here the court’s task is limited to the examination of the record solely to make that determination of whether or not the Barnstable Conservation Commission, in denying the pier, was supported by substantial evidence. See Bielawski v. Personnel Administrator of Division of Personnel Administration, 422 Mass. 459 (1996), quoting from Gloucester v. Civil Service Commission, 408 Mass. 292 (1990). In reviewing the record, this court will inquire as to whether or not the decision made by said commission was, “legally tenable and supported by substantial evidence on the record as a whole.” “Substantial evidence” means “such evidence as a reasonable mind might accept as adequate to support a conclusion,” G.L.c. 30A, § 1 (6), a test which takes into account the entire record, both the evidence supporting the agency’s conclusion and whatever in the record fairly detracts from the weight of that evidence. See New Boston Garden Corporation v. Assessors of Boston, 383 Mass. 456, 466, 420 N.E.2d 298 (1981), and Coveil v. Dept of Social Services, 439 Mass. 766 (2003).
So that this court must determine in the final analysis whether the Commission’s decision was based on reasoning relevant to the evidence presented before it and whether the Commission’s findings and conclusions are supported by substantial evidence in the record. Boston Edison Co. v. Boston Redevelopment Authority, 34 Mass.App.Ct. 37 (1977). The plaintiffs are also claiming that the decision by the Conservation Commission was based on an ad hoc agenda. Fafard v. Conservation Commission of Reading, 41 Mass.App.Ct. 565 (1996). The plaintiff further argues that when the Commission denied the Plantiffs’ Notice of Intent because of (1) shellfish and (2) recreation, that the interest of shellfish is regulated by the Wetlands Protection Act and the state Wetlands Regulations. Therefore, the decision is based upon that interest and can only be valid if the Barnstable bylaw regulates the interests more stringently than the Wetland Protection Act. Under Section 11 of the bylaw regarding burden of proof, the applicant shall have the burden of proving by a preponderance of credible evidence that the work proposed in the application will not have an unacceptable significant and cumulative effect upon wetlands values protected by this bylaw. Failure to provide adequate evidence to the Commission supporting this burden shall be sufficient cause for the Commission to deny a permit or grant a permit with conditions. Under Section 14, labeled “Definitions,” the following definitions apply to the interpretation of this bylaw; unless otherwise defined here, definitions found in 310 CMR also apply to this bylaw. Nowhere within the definitions are found the definition of “shellfish.” The plaintiffs’ claims that Article 27, Section 14, absent the definition of “shellfish,” that the bylaw would default to the definitions found in 310 CMR state Wetlands Protection Act. Because the bylaw adopts the regulation contained in 310 CMR pertaining to shellfish and is no more stringent than 310 CMR of the Wetlands Protection Act, the decision by the Commission which is based upon the interests of shellfish is preempted by the Department of Environmental Protection superseding order of conditions which authorized the proposed project.
The second basis of the plaintiffs’ claim is that the Commission’s decision based on the interest of recreation is not supported by substantial evidence in the record. The appropriate bylaw in this regard, entitled “Recreation,” is defined as any leisure activity or sport taking place in/on or within 100 feet of a resource area which is dependent on the resource area and its values directly or indirectly for its conduct and enjoyment. *349 Recreational activities include but are not limited to the following: non-commercial fishing and shellfish-ing, hunting, boating, swimming, walking, painting, bird-watching and aesthetic enjoyment. Structures and activities in or within 100 feet of a resource area shall not have a significant effect on public recreation values. Notwithstanding this definition, new or expanded recreational activities shall not have a significant effect on other wetlands values identified in Section One of this ordinance.
At the second meeting, the applicants had redesigned their pier so that the elevation would be 8.5 feet, whereas before it was 5.6 feet above the mean low water. This new design would allow shellfishermen and small boats to maneuver under the pier, and that the overall length of the pier was shortened by 12 feet. That the proposed location of the pier on Cotuit Bay is at a point where the mean low water width of the bay exceeds 1,500 feet and its location would be several hundred feet from a marked navigation channel. Therefore, it would have no impact on recreation, navigation or boating.
The findings made by the Commission in large part are not reflective of what the evidence was before the Commission. In finding (7.), the Commission “Took testimony and correspondence from recreational shellfishermen who cited likely adverse impacts to shellfishery should the project ensue.” The petition and comments from the shellfishermen were nonspecific to the area; as the plaintiff points out, the information contained in the record is at best “anecdotal” and discloses a “deep-rooted” objection to any and all piers in the “three bay area” which is based upon, as pointed out by the plaintiff, the belief and findings that all piers will adversely impact shellfish and recreation.
Finding (10.) of the Commission that based upon the testimony provided the Commission finds it more likely than not that the proposed pier will inhibit and impede access to shellfishery by recreational shellfishermen is not supported in the record. The shellfishermen are not impeded when one considers that the plaintiffs’ second proposed pier is 8.5 feet above the mean low water mark which would grant access to any clam beds or quahogs by shellfishermen who would enter the area from Cordwood Lane.
The substantial evidence before the Commission is that the area at one time was a shellfish relay area and that the last time it was used as such was in 1995. There is no information before the Commission that that very same shellfish relay area has been used since then for that purpose. It is not even clear whether the area itself is in fact in a shellfish relay area or within 100 feet of a shellfish relay area, and it would also appear that the Town of Barnstable’s last involvement would have been in 1995 with the placement of the 1200 or so bushels of quahogs. There was no evidence before the Commission that that area had been fished recreationally or commercially by anyone who voiced opposition to the pier or by anyone who had signed the petition. In review of the comments from the various commissioners at the January 14th meeting, one commissioner is to have stated, ‘This is a relay area or immediately adjacent to the relay area. I haven’t seen a map, but on the other hand drawing a line on a map usually doesn’t change habitat, so that I suspect that everything from Cordwood Lane all the way down to Cotuit Oyster is more or less the same habitat. It’s in a prime shellfish habitat area. The whole area is prime shellfish habitat.” Clearly, this statement, although not a finding, is not based upon any evidence before the Commission. Another commissioner stated, “Scientific evidence exists which shows apparently the deleterious effect on shellfish associated with docks, piers and boats in shallow waters. It’s in a state relay area and it’s pretty clear that we have directive from the state level not to allow a pier in such a place.” Another commissioner stated, “I find that this pier is in a shellfish habitat; that the applicant has made an effort to reduce the impact of this structure . . . but reducing it doesn’t eliminate it. This is going to have a detrimental effect on this resource.” This is the same commissioner who said, “Although I’m not sure how much better that’s going to make us feel,” when the plaintiff requested a continuance to determine the exact location of the relay resource area. This is some indication of an ad hoc agenda.
In the finding (12.) that the locus is but one of approximately eight parcels without a pier which directly abut the existing shellfish area, the Commission finds that the project will have a significant cumulative impact upon the shellfishery as regulated under Article 27. This is not based upon any evidence in the record since there are no piers in the area and the finding itself would lead one to believe that it is not in the shellfish relay area.
This court is mindful that the agency’s decision must be given due weight with regard to their experience, technical competence, and specialized knowledge of the agency, as well as the discretionary authority conferred upon it. Flint v. Commissioner of Public Welfare, 412 Mass. 416,420 (1992). In this case the generalizations about this area being a significant shellfish habitat is unsupported by substantial evidence, is arbitrary and an abuse of discretion. This court is not substituting its own view of the facts.

CONCLUSION

This Court finds that the decision of the Barnstable Conservation Commission in denying the application under the Barnstable bylaw to construct a pier is in fact preempted by the Department of Environmental Protection’s superseding Order of Condition that the decision based upon the interest of shellfish and fisheries is unsupported by substantial evidence in the record. The decision of the Commission is therefore annulled and judgment will enter for the plaintiffs.