Kane, Robert J., J.
Plaintiff has filed this appeal pursuant to G.L.c. 249, §4, seeking review of the Barnstable Conservation Commission denial of their application for a permit to remove an existing outhaul post and to lengthen and reconstruct an existing pier and to add a ramp and float on property located at 791 Old Post Road in Cotuit, Massachusetts. This case is presently before the court on the plaintiff s motion for judgment on the pleadings. For the following reasons, the plaintiffs motion is DENIED.
BACKGROUND
On February 20th, 2004, the plaintiff, Robert Turnbull (Turnbull) filed a Notice of Intent with the Barnstable Conservation Commission (Commission) to reconstruct a pier at 791 Old Post Road in Barnstable. According to the project description, Turnbull wanted to eliminate an existing outhaul post, to reconstruct and lengthen an existing pier and to add a seasonal ramp and float that would be shared with the adjacent property located at 797 Old Post Road. On March 23, 2004 and June 8, 2004, the Commission held public hearings. Turnbull’s pier project was denied on June 29th, 2005.
On July 16, 2004, the Commission entered its findings and order denying the permit reqúest under G.L.c. 131, §40, in the interest of protecting shellfish and under Article 27 of the Town of Barnstable General Ordinances, in the interest of recreation and shellfish. On September 28th, 2004, the Department of Environmental Protection (DEP) granted a Super-ceding Order of Conditions approving the project.
I. Administrative Record
The revised pier plan submitted on May 21, 2004 is the subject of this administrative appeal to the Superior Court. The following facts appear in Administrative Record.
Licensed in 1995, the existing wooden pier and outhaul post extends approximately 73 feet offshore. The pier extends 44 feet in length and from the pier end, the outhaul post extends approximately 29 feet. A non-motorized dinghy is attached by a rope to the outhaul post and is accessed though a pulley system from the end of the pier. The dingy provides access to Turnbull’s 27-foot boat which is moored closer to the channel.
The proposed pier would be constructed of aluminum in a gangway style design and be approximately 76 feet long by 4 feet wide. The existing stairway that provides public access to the beach would be demolished and replaced by a three-foot wide aluminum stairway. At the end of the pier, a seasonal 3’ x 12’ ramp would connect to an 8’ x 20’ float making the entire structure extend approximately 88 feet offshore to the float’s end during the boating season. The ramp and float would extend another 33 feet and run parallel to the shoreline. Berthing spaces on either side of the float would be used for small motorized crafts. The float would have float stops and reside in approximately 2.5 feet of water based on Mean Low Water (MLW) datum on the inside berth and reside in approximately 3 feet of water for the outside berth.[1]
The distance between the Mean Low Water (MLW) to the underside of the proposed pier is approximately 5.2 feet at the landward end and approximately 7 feet toward the seaward end. There would be three pairs of pilings spaced 38 feet apart, approximately 12 inches in diameter. The pier planks would be spaced 3/4 inch apart. The combined shore frontage of the two properties makes the total mean high water length approximately 340 feet of which the proposed pier *446 would extend 88 feet beyond mean high width of the waterway and 64 feet beyond the mean low.
The pier site is located in the Corwood Lane fish relay area on the West side of the Cotuit Narrows (Narrows) that connects the North Bay with Cotuit Bay. Marine Fisheries deemed the site a significant shellfish habitat and as such, is afforded protection under the Wetlands Protection Act (310 C.M.R. §10.34). The channel located in the middle of the Narrows is approximately 80 feet wide. There would be 122 feet between the proposed float and the channel. That distance would be reduced accordingly, depending on the size boat docked on the floats outside berth. According to the plan, there would be approximately 400 feet between the end of the proposed pier and the end of the nearest pier located on the opposite side of the channel.
At the first hearing on March 23, 2004, Arlene Wilson (Wilson) presented Turnbull’s plan to the Commission. Statements and inquiries made by the Commission members as well as reports and letters of opposition were discussed and entered in the administrative record. Wilson’s intent at the first hearing was to gain feedback and continue discussions at a later hearing date.
In her presentation, Wilson emphasized the following points: 1.) The plan would serve two lots as opposed to one and be deeded accordingly. 2.) Shellfish habitat would benefit because the pier would be constructed of aluminum materials as opposed to CCA lumber. 3.) The distance of 38 feet between the pilings would enable more sunlight to penetrate through to the waters and vegetation underneath, enhancing shellfish habitat in the area. 4.) Public beach access would benefit because the project would improve the grade and comfort of the stairway. 5.) The pier height provides sufficient room for foot passage and small hand powered or muscle powered boats, offering greater access to recreational boaters as well as commercial and recreational fishermen. 6.) The pier would only extend an additional six feet beyond the existing outhaul post. 7.) Navigation could be improved in the area by moving Turnbull’s existing mooring further away from the channel.
In response to Wilson’s presentation, Commissioner Peter Sampou noted that a shared pier plan with the adjacent property was admirable and consistent with the Commission’s preference for shore-owners to take this approach. As for Turnbull’s mooring, Vice Chairman Robert Lancaster stated that the Commission’s longstanding policy requires forfeiture of an existing mooring in exchange for a pier and asked why the owner needed the new pier design if he was going to retain the mooring. Wilson responded that the water depths around the float were too shallow to accommodate Turnbull’s boat but assured the Commission that Turnbull would abide by any boat specifications deemed appropriate by the Commission at the float site.
Robert Lancaster read Tom Marcotti’s shellfish report for the record that described the proposed pier as “progressive” “in terms of minimizing the direct and/or potential detrimental impacts to the shellfish habitat” due to its seasonal nature, choice of structural material and spacing between pilings. The report noted concerns however, regarding “the variability of water depth on minus and extreme tides” in the area of the float located between 80 and 100 feet from the revetment. This comment sparked significant discussion by the Commission regarding their concern for potential inconsistencies in actual water depths taken at the site and those outlined in the proposed pier plan based on engineering survey data used to devise the plan.
A total of six e-mails and letters (letters) voicing opposition to the proposed pier were received. Each letter was read by Robert Lancaster, Vice Chairman of the Commission to be entered in the record. Three out of the six letters received in opposition of the pier were sent by either a member and or current or former representative of the Association of the Cotuit Mosquito Yacht Club (ACMYC) or Cotuit Mosquito Yacht Club (CMYC). In summary, the majority of the letters objected to the pier because of small craft usage and the navigational difficulties associated with the pier’s proposed location, stating that small crafts use the shallow waters in the Narrows in order to give way to larger boats confined to the channel. The letters also stated that the challenges of handling wind and rapid tidal conditions is magnified by the constrictive nature of the Narrows and small sailboats need to tack along the shoreline in order to navigate these waters successfully. Only one letter, sent by William Hemmerdinger, simply opposed any pier construction in Cotuit and to the expansion of private assets into public waterways and resources in general.
Christopher Jackson’s letter dated March 23, 2004, was sent on behalf of the ACMYC and stated they oppose the new pier because it is located in “one of the most constricted passageways in the three bays area” where a tremendous amount of boat traffic occurs during the summer months. Jackson wrote, that in order to give way to larger boats in the channel, smaller vessels need to use the area where the proposed pier will be located in order to pass safely, particularly sailing vessels because they have to tack back and forth along the shoreline against the prevailing southwest wind. The letter further stated that the tidewaters flow rapidly in this location and the funnel shape entrance of the Narrows magnifies the strong southwest wind making the waters choppy and creating conditions that compound the difficulty for smaller boats to pass through this point successfully. Additionally, Christopher Jackson wrote that in the ACMYC’s opinion, the proposed T design of the float and platform (ramp), combined with the space re *447 quired to dock a boat alongside the float, takes up more space than may be apparent because its longitudinal position interferes with maneuvering room needed by a small sailboat to tack along the shoreline.
Sophie Hemmerdinger, the Head Instructor and Commodore of the CYMC, enclosed with her letter, a photo of young sailors in their small boats. On behalf of the young sailors, she wrote that sailors are at the disposal of the wind and tides and often sail close to the beach and she had seen “many ugly incidents involving a small child and an unforgiving pier.” In her opinion, “allowing another dangerous obstruction increases the risk of accidents and loss of enthusiasm in this wonderful activity.” As former Directors of the ACYMC’s, instructional sailing program, and parents of the past two Commodores of the CYMC, Jane and Greg Austin’s letter wrote about the area’s frequent use for races and instructional sailing programs. They opined that the pier would create a significant obstacle to sailors.
David Churback, member of the CMYC and Cotuit Rowing Club, stated in his letter that the pier would be detrimental to rowers, recreational fisherman and small boat sailors. He noted that the area is popular with anglers fishing for striped bass. As a daily rower in the Narrows from March to December, he opined that “a pier in one of the most constricted section of the three bays would be a massive impediment to rowers” since every obstacle is a potential collision to rowers who face backwards and constantly have to look over their shoulders to navigate successfully. The proposed pier, in David Churback’s opinion, would be detrimental to small boat sailors as well because they have to tack outside the channel during periods of heavy boat traffic and if constructed, the pier would force these sailors into the channel, raising the probability of an accident.
During the hearing, Commission members discussed their familiarity with the Narrows’s wind, rapid tide and the need for smaller boats to navigate outside the channel. During the discussion, Vice Chairman Robert Lancaster inquired about a sandbar located Southwest of the pier location just off Grand Island in the channel without reference to any available map. Lancaster opined that the sandbar “causes boats to jog a bit” giving little room to maneuver to the starboard side of the channel.
Mentioning his sailing background and experience sailing in the Narrows, Lancaster noted that he was familiar with the Narrows’s maneuvering difficulties raised by members of the ACYMC and CYMC and stated that he had a “heck of a time” navigating through the Narrows with his Sunfish. In order to tack in the opposite direction, Lancaster had to get off his boat, pull the center board up and push the boat back out from the shoreline. Based on his familiarity with the pier site, he commented that a pier projecting further out “definitely has the potential certainty of creating some navigational difficulties for people in little boats.”
Commissioner Peter Sampou, who fishes for striper in this area, commented that his canoe could easily go underneath the proposed pier, but noted that if the seasonal section of the pier is in the water during the months of April and May it would restrict shore fishing for striper because the fishing line could easily get entangled with the piling. While not familiar with sailing in the Narrows, but having sailed in his youth, Commissioner Sampou also commented that he could readily appreciate the potential difficulties in navigating the area in a sailboat and expressed concern for the young sailors of the CMYC sailing against the tide who may need to walk their boat along the Western pier side shoreline, particularly since the East side of the Narrows drops off so deep that you are unable to walk a sail boat around that point if you get into trouble.
On June 8, 2004, Wilson presented her revised plan to the Commission and stressed that in response to the Commission’s concerns the modified plan included, float stops and a repositioning of the float away from the shoreline resulting in increased depths of six inches around the float consistent with Department of Environmental Protection (DEP) guidelines. According to Wilson, the seasonal ramp and float could also be put in the water as late as June 15th, so recreational fisherman would have greater access to the area in the months of April and May. Wilson noted, that with these revisions, the new pier would comply with the DEP’s guidance document for Small Dock and Piers. For example, in addition to the float depth requirements, the pier would only extend 64 feet beyond the mean low, representing 64% of its allowable length with a combined shore footage of both properties at approximately 340 feet. In addition, the pier would only use 12.8% of its allowable 20%, in mean low water width, and the distance between pilings of 38 feet would also be well within the suggested guidelines. Head clearance to walk at mean high water at 5 feet to the stringers would also provide easy access for recreational boating and shellfishing underneath the pier.
Acting Chairman, Walter Wannie, read into the record other correspondence regarding the proposal. These included, Tom Marcotti’s shellfish report that remain unchanged from the prior hearing and a letter written by Joe Gibbs of the Waterways Committee, indicating that he saw no navigational issues with the proposal, but inquired as to whether the Turnbull’s boat “moored dangerously close to the channel” could be moved to the new pier location. In response, Wilson reiterated Turnbull’s willingness to move the mooring to a new location at the direction of the mooring officer.
Also read in to the record, was a letter sent by Charles Goodwin, a neighbor of Turnbull who included photographs of the pier site at low tide. Goodwin stated concerns in the letter about the actual *448 water depths at the site. He wrote that he is unable to sail his boat that draws 18 inches with the center board up in that location during low tide and is unable to sail during high tide with a draw of 3.5 feet without slightly pulling up his center board.
Toward the end of the hearing, Commissioner Peter Sampou, asked his staff to remind him if any correspondence had been received from the ACMYC or anyone else who likes to sail in this region, noting that the Cotuit Narrows are one of the most constricted areas in Cotuit Bay. Administrator, Rob Gatewood in summary, stated that there was a lot on the record from those who sail in the area and that “essentially it sums up as a devastating critique for this project.” Furthermore, according to Gatewood, the record reflected a need for boats to cheat moorside at this location because of a sandbar located on the opposite side of the channel. Rob Gatewood also noted that the only other pier located on the west side of the Narrows is a seasonal pier known as Stuckey’s pier, just south of the proposed pier where the Narrows begin to widen and that Turnbull’s pier would be the first 70 to 80 foot pier in this particular area. The east side piers, according to Peter Sampou are in “very different kind of water” tucked back inside the Narrows and do not protrude out beyond the West side point.
Upon review of the state 2001 GIS map, Wilson directed the Commission to review the sketch of the proposed pier on the map and noted that the sandbar referenced earlier is so far South it is not visible. In her opinion, boaters would be offset by the Stuckey’s pier and be able to tack back and forth by the time they got to the Turnbull site.
On July 19, 2005, the Commission issued their findings of fact regarding the proposed construction of the pier and denied the project under Massachusetts General Laws Chapter 131, §40, in the interests of protecting land containing shellfish and under Article 27 of the Town of Barnstable Ordinance in the interest of recreation and shellfish. In issuing their decision, the Commission made 10 specific findings regarding the proposed reconstruction of the pier. Five findings were based on adverse impact to recreation with the remaining findings on adverse impact to shellfish.
In summary, the Commission found the following recreational impacts:
6. The locus is a significant recreation area for boating in the popular 3 bays, where the anchorages have long been closed to new moorings because of the sheer volume of boat traffic. Whereas motor craft dominate the channel, small sailboats use the broader navigational fairway in the Narrows to contend with the challenges of safety and tide, current and wind conditions.
7. While per se compliant with the Commission regulation for length and offset to the channel, the proposed pier presents a significant and adverse impact to recreational navigation. Evidence in the form of public testimony and discussions emerging from within the board gave first-hand experience regarding the degree to which the near shore area of the locus is important to small boat sailing. The ACYMC’s opinion (via Christopher Jackson’s letter) best summed up the impacts from the proposed pier. “In a strong Southwest wind, which is magnified by the funnel shape of the entrance, a steep chop builds up; the tide also flows rapidly in this location. These factors compound the difficulty for small boats attempting to pass this point. A pier in this area which is one of the narrowest points of the Narrows, would make matters even worse.” The proposed T design would take up more room than apparent because the longitudinal extent interferes with a small sailboat’s ability to tack along the shoreline.
8. The revised design makes the recreational impact worse rather than better because it extends the float and gangway further toward the channel. The Commission also notes that the ACMYC and the CMYC have been providing sailing and instruction for over 100 years and that over 250 sailors participate each summer in their programs.
9. Commissioner Vice Chairman Lancaster, himself a seasoned sailor, commented on the fact that sailboats heading southwest have no room to maneuver on the Grand Island side of the channel stemming from a sandbar. All the maneuvering room is on the proposed pier side of the channel affecting the sailboats tacking ability in the vicinity of the pier.
10. The proposed pier would significantly and adversely impact recreation by reducing the necessary maneuvering room. The existing outhaul post is much less of an impact than the proposed pier because the dinghies on the outhaul post point in the direction of the prevailing southwest wind, ensuring the outhaul piling itself is the most channelward obstacle encountered. “In this restricted navigation area where every foot counts in the safe passage of small boats, the location of the float with a bqat berthed on the channelward side spells a significant impact to recreation.”
DISCUSSION I. Substantial Evidence
Because the DEP has granted the plaintiffs proposal through a Superceding Order of Conditions under G.L.c. 131, §40, the court is confined to consider the Commission’s denial of the pier proj ect under Article 27, of the Town of Barnstable General Ordinances. At issue is whether the Commission’s findings that the proposed pier project would have a significant and cumulative impact upon recreation was based on substantial evidence.
Review of an agency decision through certiori is limited to correcting substantial errors of law apparent on the record which adversely affect material rights. G.L.c. 249, §4; Carney v. City of Springfield, 403 Mass. 604, 605 (1995). “Where the action sought to be *449 reviewed is the conservation’s commission grant or denial of an order of condition, the substantial evidence standard applies.” Lovequist v. Conservation Comm’n of the Town of Dennis, 379 Mass. 7, 17, (1979); T.J.D. Development Corp. v. Conservation Comm’n of North Andover, 36 Mass.App.Ct. 124, 128 (1994).
The substantial evidence standard requires this court to inquire into whether or not the Commission’s decision was based on evidence that “a reasonable mind might accept as adequate to support a conclusion,” New Boston Garden Corp. v. Board of Assessors Boston, 383 Mass. 456, 466 (1981), and is limited to the examination of the record. See Bielawski v. Personnel Administrator of Division of Personnel Administration, 422 Mass. 459 (1996), quoting from Gloucester v. Civil Service Commission, 408 Mass. 292 (1990).
Turnbull contends that: 1.) The Commission’s denial of the pier project was not based on substantial evidence and suggests that the communications received in opposition were “sweeping generalizations” that oppose all piers. 2.) There is nothing in the record to support the Commission’s findings of “navigational problems related to the wind, maneuverability, sandbars and tacking etc.” at the pier location and that their findings ignored the conclusions of the Barnstable Mooring Officer who found no navigational issues surrounding the proposal. 3.) The evidence of opposition was received prior to receipt and review of the revised plan, suggesting that -the opponents did not take the time to review the revisions. 4.) The Commission relied on its own expertise as a substitute for substantial evidence as opposed to evaluating the evidence in light of its expertise,"which is prohibited in making their findings. Cobble v. Commissioner of the Department of Social Services, 430 Mass. 385, 394 (1999). 5.) The Commission’s findings are flawed because the specifications complied with pier and dock regulation promulgated by the Commission.
After review and consideration of the arguments and the administrative record, the court concludes that the Commission’s findings were supported by substantial evidence. The record supports the Commission’s determination that the pier site is a significant recreation area for small boats that face navigational difficulties from the prevailing southwest wind and tide compounded by the constrictive nature of the Narrows. There was substantial evidence for the Commission to conclude that small crafts and sailboats utilize the shallow waters outside the channel and that the location of the pier with its ramp and float design running parallel to the shore would reduce the maneuvering room required for a small sailboat to tack along the shoreline. In summary, despite compliance with DEP guidelines, and with aspects of the Commission’s regulations, there was substantial evidence in the record for the Commission to conclude the proposed reconstructed pier, ramp and float would have a significant and cumulative impact upon recreation.
Under Article 27, Barnstable Wetlands Protection, Section I, recreation is categorized as one of many interests that are collectively protected under the wetland values in the ordinance.[2] “Recreation” under Article 27, is defined as any leisure activity or sport taking place in, on, or within 100 feet of a resource area which is dependent on the resource area and its values either directly or indirectly for its conduct or enjoyment. Boating is categorized as a recreational activity under the ordinance. Additionally, the Town of Barnstable has promulgated standards to regulate piers and docks to protect the wetland resources. See Regulations for Private Piers and Docks amended June 5, 1990. In Section 6, of Article 27, the ordinance states that the denial of permit and conditions can be based on failure to meet design specifications, performance standards, policy guidelines or other requirements in regulations of the Commission as well as “failure to avoid or prevent unacceptable significant or cumulative effects upon the wetlands values protected by this ordinance.’’[3]
Recreation is not a protected interest under G.L.c. 131, §40. Therefore, despite the Superceding Order granted by the DEP, Article 27, enables the Commission to deny a pier request solely on the ground of protecting the interests of recreational resources that occurs within 100 feet of the resource area. Boating is considered a recreational activity under the ordinance and substantial evidence supports the Commission’s conclusion that the pier site is utilized heavily by small boats in the Narrows, including sailboats and rowboats. Quite contrary to the plaintiffs contentions, there is nothing in Article 27 that implies approval is granted if a pier plan complies with the guidelines. It clearly states that the Commission can deny the Notice of Intent based on failure to avoid or prevent significant or cumulative effects to wetland values, which is the basis of denial in this case.
With the exception of one letter, the administrative record reveals that letters opposing the pier proposal did not reflect sweeping generalizations against all piers. Five letters were quite specific with the majority describing small craft usage and navigational difficulties in the area. Several of those letters specifically discussed the constrictive nature of the Narrows and the need for smaller boats to use the shallow waters outside the channel in order to give way to the larger boats that are confined to the deeper channel waters. Christopher Jackson’s letter sent on behalf of the ACMYC and Sophie Hemmerdinger, the Commodore of the CYMC and Head Instructor of ACMYC, commented on how frequently small sailboats use the shallow waters near the pier site and to how challenging the wind and tide conditions are in the area, forcing sailors to tack back and forth along the shoreline in order to navigate safely through the Narrows. Sophie *450 Hemmerdinger’s letter also spoke to the extent young sailors use the Narrows and to the dangers posed by piers and other obstructions. David Churbuck’s letter provided additional evidence that other small boats, such as rowboats and fisherman also use the area of the pier site and that the proposed pier seems to be in a critical area that is already difficult enough to transit.
Vice Chairman of the Commission, Robert Lancaster, a seasoned sailor, had personal experience sailing near the pier site and to the navigational difficulties associated with the Narrows area. His personal experience in sailing his Sunfish and having to grip the shore in order tack back successfully supplemented more than sufficient record evidence on the challenges in maneuvering a small sailboat and to the need for small sailboats to use the shallow waters to tack successfully along the shoreline.
Furthermore, the record reveals that a reasonable mind would conclude that the proposed T shaped design of the pier would be more detrimental to sailboats than the existing pier and outhaul post. This would be the first pier of this length in the west side area of the Narrows, with the exception of another seasonal pier positioned where the Narrows begin to widen. Letters of opposition stated that the pier site is in a very constricted area of the Narrows and presents challenges to sailboats trying to maneuver and tack back and forth in the area. Therefore, a reasonable mind can conclude a pier extension in season, of an additional 43 feet beyond the existing pier and another extension of 33 feet along the shoreline, that juts out closer to the channel, would significantly impact a sailboat’s maneuvering room to tack back and forth along the shore.
In this court’s analysis the record must be reviewed in its entirely, including evidence that supports and detracts from the Commission’s conclusions. See New Boston Garden Corporation v. Assessors of Boston, 383 Mass. at 466, and Covell v. Dept. of Social Services, 439 Mass. 766 (2003). According to the record, there are two potential benefits that can be gleaned from Turnbull’s proposal. First, the pier would be shared by the adjacent property and second, the new stairway would enhance public beach access.
The record reveals however, little benefits to recreational activities in the area. While the Mooring Officer saw no navigational issues regarding the proposal, he did inquire whether the new pier plan would eliminate the need for Turnbull’s boat to be moored dangerously close to the channel. According to the record, the boat could be moved further away from the channel, but the plan does not eliminate the need for a mooring entirely which is a general policy of the Commission. Furthermore, while the record supports that the pier design has aspects that benefit shellfish habitat, those aspects of the proposal have no positive impact on recreational activities, except that the headroom is adequate for small boats to access the area underneath the pier. Although the proposal delays putting the seasonal section of the ramp and float in the water until mid-June to accommodate recreational fishing, it is not enough of a benefit to offset the other evidence that supports the findings by the Commission. After reviewing the record in its entirety, this court finds that there is not enough evidence to detract from the Commission’s conclusions that the pier would have a significant and adverse impact on recreation.
This court concludes that the record reveals the Commission used its expertise and familiarity with the issues to guide them in their decisions and findings and did not substitute their expertise for substantial evidence. Due weight must be given to the “experience, technical competence and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it.” Cobble v. Commissioner of the Department of Social Services, 430 Mass. 385, 391 (1999). Therefore, this court must defer to the technical competence and discretionary authority of the agency in its review.
The record reflects that during the hearings, Commission members reviewed the evidence read into the record and used their expertise to ask questions and confirm the issues raised in the letters of opposition. While the court recognizes that the evidence is slight regarding the findings for the sandbar, and its impact on maneuvering, there are photographs on the record and enough additional evidence to confirm that there are navigational difficulties encountered at the locus noted in the Commission’s findings.[4] Vice Chairman Lancaster’s comments at the hearing regarding the sandbar however, were not used in this court’s determination that there was substantial evidence supporting the Commission’s decision to deny the pier project. The court also recognizes that there was no independent evidence in the record to support the membership numbers of the yacht club or years in existence but, the court still finds there was substantial evidence to support the finding that the locus is a significant area for recreational boaters.
In conclusion, after reviewing the administrative record in its entirely, this court finds that there was substantial evidence to support the Commission’s finding that the proposed reconstructed pier ramp and float would have a significant and adverse impact on recreational boating in the area, and therefore the plaintiffs project was properly denied.
II. Article 27 §11 of Wetlands Protection Bylaw is Arbitrary and Capricious
Turnbull, relying on a Superior Court case, argues that the language of Article 27’s bylaw defining cumulative effects is arbitrary and unreasonable because the terms “unacceptable” “significant” and “cumulative effect” are vague and indefinite placing an unreasonable burden on the plaintiff. This court notes that these terms are consistent with those in DEP standards and regulations regarding shellfish impact. Furthermore, the Superior Court case relied on by the plaintiff is not controlling, nor did the court cite to any *451 controlling authority in making their determination. Significant is defined as “having or likely to have influence or effect,” which can be readily ascertained by administrative bodies. The term significant, like the term substantial, is consistently used in legal standards to measure factual determinations by the court as illustrated by this finding.
III. Constructive Grant of Order of Conditions
Turnbull argues that the Commission constructively granted the application for reconstruction of tijie pier by exceeding the time periods required in Article 27 Section 5 of the Barnstable Ordinances because the decision was issued on July 16, 2004, thirty-eight days after the public hearing on June 8, 2004. The bylaw states that: “The Commission shall issue its decision on the Notice of Intent in writing within twenty-one (21) days of the close of the public hearing thereon.” The requirement “relates only to the time of performance of duty by a public officer and does not go to the essence of things to be done” Cheney v. Coughlin, 201 Mass. 204, 211 (1909). Constructive approval is an appropriate remedy only when a legislative enactment is clearly specified. Vokes v. Avery W. Lovell, Inc., 18 Mass.App.Ct. 471, 478 (1984). Although the term “shall” is used in. the bylaw, the term does not go to “the essence of the matter,” it is therefore discretionary and not mandatory. Cullen v. Building Inspector of North Attleborough, 353 Mass. 671, 679-80 (1968). Accordingly, this court will not construe the literal meaning of the bylaw and grant constructive approval to the plaintiff.
ORDER
For the foregoing reasons, it is hereby ORDERED that the plaintiffs motion on the pleadings is DENIED.

 The revised plan, submitted on May 21, 2004, changed the position of the ramp and float from the original plan. The float would be located closer to the channel in a south-westerly direction. This change resulted in a six-inch increase over the prior plans in water depths around the float. Float stops were also added to address concerns about water depths around the float in extreme tidal conditions.

 ARTICLE XXVII. WETLAND PROTECTION.
Section 1. PURPOSE the purpose of this ordinance is to protect the wetlands and related water resources, and their values and functions, including but not limited to, the following public or private water supply; ground water; storm damage prevention; flood control; erosion and sedimentation control; prevention of water pollution; wildlife habitat; shellfish; fisheries; recreation; public trust rights in trust lands; aesthetics; agricultural and aquacultural values; and, historical values (collectively, the wetland values protected by this ordinance).
Town of Barnstable Ordinances

 Section 6. PERMITS AND CONDITIONS ... The Commission is empowered to deny a permit for failure to meet the requirements of this ordinance; for failure to submit necessary information and plans required or requested by the Commission; for failure to meet the design specifications, performance standards, policy guidelines or other requirements in regulations of the Commission; for failure to avoid or prevent unacceptable significant or cumulative effects upon the wetlands values protected by this ordinance where it is deemed that the denial is necessary to preserve the environmental quality of those resource areas; and where no conditions are adequate to protect those values . . .

 Transcript of the hearings does not reflect discussions of any photographs depicting the sandbar however, photographs in Exhibit 17 are referenced in the Commissions brief and are part of the Administrative Record.